UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

IN RE:

MATCO ELECTRONICS GROUP, INC.    CASE NO. 02-60835
                Chapter 11
        Debtor     Jointly Administered
---------------------------------------------------

IN RE:

U.S. ASSEMBLIES NEW ENGLAND, INC.   CASE NO. 02-60836

        Debtor
---------------------------------------------------

IN RE:

U.S. ASSEMBLIES IN FLORIDA, INC.    CASE NO. 02-60837

        Debtor
---------------------------------------------------

IN RE:

U.S. ASSEMBLIES RALEIGH, INC.    CASE NO. 02-60838

        Debtor
---------------------------------------------------

IN RE:

MATCO TECHNOLOGIES      CASE NO. 02-60839

        Debtor
---------------------------------------------------

IN RE:

U.S. ASSEMBLIES SAN DIEGO, INC.    CASE NO. 02-60840

        Debtor
---------------------------------------------------

IN RE:

CAROLINA ASSEMBLIES, INC.     CASE NO. 02-60841

        Debtor
---------------------------------------------------

IN RE:

U.S. ASSEMBLIES HALLSTEAD, INC.                    CASE NO. 02-60842

                                    Debtor
---------------------------------------------------
IN RE:

U.S. ASSEMBLIES IN GEORGIA, INC.                   CASE NO. 02-60843

                                    Debtor
---------------------------------------------------
IN RE:

U.S. ASSEMBLIES ENDICOTT, INC.                     CASE NO. 02-60844

                                    Debtor
---------------------------------------------------
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE MATCO ELECTRONICS
GROUP, INC., U.S. ASSEMBLIES NEW ENGLAND,
INC., U.S. ASSEMBLIES IN FLORIDA, INC., U.S.
ASSEMBLIES RALEIGH, INC., MATCO
TECHNOLOGIES, U.S. ASSEMBLIES SAN DIEGO,
INC., CAROLINA ASSEMBLIES, INC., U.S.
ASSEMBLIES HALLSTEAD, INC., U.S. ASSEMBLIES
IN GEORGIA, INC., and U.S. ASSEMBLIES ENDICOTT, INC.

                          Plaintiffs

              vs.                              **ADV. PRO. NO. 02-80095**

AMERICAN BOARD COMPANIES, INC., T.L.
ACQUISITIONS CORP., BSB BANK & TRUST COMPANY,
AMERICAN MANUFACTURING SERVICES, INC.,
MATTHEWS HOLDING, INC., THE MATCO GROUP,
INC., JAMES MATTHEWS, LARRY HARGREAVES, AND
LAWRENCE DAVIS

                          Defendants

THE OFFICIAL COMMITTEE OF UNSECURED

3

CREDITORS OF THE MATCO ELECTRONICS
GROUP, INC., U.S. ASSEMBLIES NEW ENGLAND,
INC., U.S. ASSEMBLIES IN FLORIDA, INC., U.S.
ASSEMBLIES RALEIGH, INC., MATCO
TECHNOLOGIES, U.S. ASSEMBLIES SAN DIEGO,
 INC., CAROLINA ASSEMBLIES, INC., U.S.
ASSEMBLIES HALLSTEAD, INC., U.S. ASSEMBLIES
IN GEORGIA, INC., and U.S. ASSEMBLIES ENDICOTT, INC.

Plaintiffs

vs.                                                **ADV.  PRO.  NO.  04-80075**

JAMES MATTHEWS

Defendant
---------------------------------------------------------------------
APPEARANCES:

NIXON PEABODY LLP                          DOUGLAS E.  SPELFOGEL, ESQ.
Attorneys for Official Committee Unsecured Creditors    Of Counsel
990 Stewart Avenue
Garden City, NY  11530-4838

HODGSON RUSS, LLP                          RICHARD L.  WEISZ, ESQ.
Attorneys for Debtors                                    Of Counsel
677 Broadway
Albany, NY  12207

DEILY, MOONEY & GLASTETTER, LLP            JOANN STERNHEIMER, ESQ.
Attorneys for James F.  Matthews           Of Counsel
8 Thurlow Terrace
Albany, NY  12203

HINMAN, HOWARD & KATTELL, LLP              ALBERT J.  MILLUS, JR., ESQ.
Attorneys for T.L. Acquisitions Corp.      Of Counsel
700 Security Mutual Building
80 Exchange Street, P.O. Box 5250
Binghamton, NY  13902-5250

G.  PETER VAN ZANDT, ESQ.
Attorney for Lawrence Davis
53 Chenango Street
 Binghamton, NY  13901-2816

MENTER, RUDIN & TRIVELPIECE, P.C.   JEFFREY A. DOVE, ESQ.
Attorneys for BSB BANK & TRUST COMPANY  Of Counsel
500 South Salina Street
Suite 500
Syracuse, NY 13202

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

## MEMORANDUM-DECISION, FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND ORDER

   The Court has before it for consideration two motions seeking partial summary judgment (the "Motions"), filed on August 23, 2004, by the Official Committee of Unsecured Creditors ("Committee")[1] of Matco Electronics Group, Inc. ("Matco"), U.S. Assemblies New England, Inc., U.S. Assemblies in Florida, Inc., U.S. Assemblies Raleigh, Inc., Matco Technologies, U.S. Assemblies San Diego, Inc., Carolina Assemblies, Inc., U.S. Assemblies Hallstead, Inc., U.S. Assemblies in Georgia, Inc., and U.S. Assemblies Endicott, Inc. (collectively the "Debtors") in connection with the Third Amended Complaint, filed by the Committee on August 18, 2003 ("2003 Amended Complaint") (Adv. Pro. 02-80095), as well as the complaint filed by the Committee on March 10, 2004 ("2004 Complaint") (Adv. Pro. 04-80075). The first Motion seeks partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure

---

[1] The Committee is comprised of the following unsecured creditors: Arrow Electronics, Inc., Avnet, Inc., Future Electronics, Heilind Electronics, Inc., Jaco Electronics, Inc., Mentec, LLC, PartMiner, Inc., Pioneer Standard-Electronics, Inc., Tyco Electronics Corporation and Ben Khoushnood, in an *ex officio* capacity. *See* Appointment of Committee of Unsecured Creditors, executed by the United States Trustee on or about March 26, 2002, and filed with the Court on March 27, 2002.

5

("Fed.R.Bankr.P."), in connection with the second, third, sixth and ninth causes of action[2] pled

in the 2003 Amended Complaint in the adversary proceeding commenced by the Committee

against the Debtors, BSB Bank & Trust Company ("BSB"), predecessor in interest to Partners

Trust Bank, American Manufacturing Services, Inc.("AMS"), James F. Matthews ("Matthews")[3],

T.L. Acquisitions Corporation ("TLA"), Larry Hargreaves ("Hargreaves") and Lawrence Davis

("Davis") (collectively the "Defendants").

The second cause of action of the 2003 Amended Complaint seeks to avoid "the

Transfers"[4] pursuant to § 544(b) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"), and

§§ 273, 273-a, 274, 275 and 276 of the New York Debtor and Creditor Law ("NYD&CL").  The

---

[2]  The Notice of Motion specifies that partial summary judgment is being sought with respect to these four causes of action.  The same four causes of action are referenced in the "conclusion" to the Committee's Motion in connection with the 2003 Amended Complaint.  The body of the Motions also refers to the fourth cause of action, which seeks judgment against Matthews, Hargreaves and Davis for their alleged breach of fiduciary duties to the Debtors as officers and/or directors.  Because the focus of the parties' arguments, orally and in the memoranda of law, as well as the Committee's Statement of Undisputed Facts, do not appear to address the "Fourth" cause of action, the Court will not consider it.

[3]  Matthews has been identified as the president and sole shareholder of Matco.  He is also the president and sole shareholder of U.S. Assemblies in Georgia, Inc.  Matco, in turn, is the sole shareholder of the remaining Debtors, for which Matthews also serves as president.

[4]  The 2003 Amended Complaint is very confusing in its definition of "the Transfers." At ¶ 136 of the 2003 Amended Complaint, addressing the Committee's first cause of action, reference is made to "[t]he Sales, Staged Auctions, Pre-Auction Transfers, Receivables Transfers, NBOC Discount, Real Property Transfers, Matthews' Loan, ABC Transfers, Tech Transfers, and/or Matco Group Transfers (collectively, the 'Transfers')."  There is some question in the Court's mind whether "the Transfers" refers only to the "Matco Group Transfers" or to all the aforementioned transfers.  The former interpretation finds support in ¶ 137 of the 2003 Amended Complaint in which reference is made to "the Sales, Pre-Auction Transfers and Receivable Transfers and Transfers . . . ."  Yet, the relief sought in the first cause of action requests that "the Transfers" be avoided.  *See id.* at ¶ 140.  Because the relief sought herein is limited in its scope and applies to specific transfers by the Debtors, the Court need not reach any conclusion concerning what is included in "the Transfers."

6

Committee also requests entry of a money judgment against the defendants pursuant to Code §

550 and that certain liens be avoided.  The Committee's third cause of action seeks similar relief

based on Code § 548(a)(1)(B).  Its sixth cause of action seeks equitable subordination of the

claims asserted by BSB, TLA and Matthews "and/or alternatively that BSB and TLA's liens

securing such a subordinate claim(s) be transferred to the estate pursuant to 11 U.S.C. § 510(c)."

¶ 174 of the 2003 Amended Complaint.  The ninth cause of action seeks to avoid "the Transfers"

and the "Holding Transfers,"[5] as preferences pursuant to Code § 547, as well as the entry of a

money judgment pursuant to Code § 550.

In its second Motion, the Committee requests summary judgment in connection with the

2004 Complaint in which only Matthews is named as a defendant.  In its 2004 Complaint, the

Committee alleges four causes of action based on certain "transfers" allegedly made by the

Debtors in the form of interest payments totaling not less than $224,000 in 2000 and not less than

$460,000 in 2001.  *See* 2004 Complaint at ¶ 3.  The Committee seeks to avoid those transfers

pursuant to Code § 544 and NYD&CL § 273 (first cause of action); Code § 544 and NYD&CL

§ 274 (second cause of action); Code § 544 and NYD&CL § 275 (third cause of action); and

Code § 544 and NYD&CL § 276 (fourth cause of action).  In addition, the Committee seeks

judgment against Matthews with respect to all four causes of action pursuant to Code § 550.

The Motions were originally scheduled to be heard on September 7, 2004.  Following two

consensual adjournments, the Court heard arguments on behalf of the Committee, the Debtors

and several defendants that opposed the Motions, including Matthews, BSB, TLA and Davis.

---

[5]  The "Holding Transfers" are identified as transfers made by the Debtors to or for the
benefit of Matthews Holding, Inc. ("MHI"), a non-debtor entity, within one year of the filing date
in excess of $320,000.

7

The parties were afforded an opportunity to file memoranda of law in support of their respective positions.  The Motions were taken under submission on January 3, 2005.

On January 18, 2005, the Court signed an Order assigning the adversary proceeding (Adv. Pro. 02-80095) to mediation at the request of the parties and appointing the Honorable John K. Pearson[6] as mediator.  By letter dated August 5, 2005 (Docket No. 170[7]), Judge Pearson reported that the parties had mediated in good faith on June 21 and 22, 2005.  However, a settlement was not reached despite further negotiations in July 2005.  In response to a letter from the Court dated August 24, 2005 (Docket No. 175), counsel for the Committee requested that the Court render a decision on the Motions (Docket No. 176).

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(F), (H) and (O).

## FACTS

The Court will assume familiarity with its prior Memorandum-Decision, issued on April 4, 2003, which addressed a similar motion made by the Committee in connection with its original

---

[6] Judge Pearson is a former United States Bankruptcy Judge for the District of Kansas, currently associated with the Hinkle Elkouri Law Firm, L.L.C. in Wichita, Kansas.

[7] In order to avoid confusion, references to docket entries are to those found in Adv. Pro. 02-80095.

8

complaint filed on April 22, 2002.  The facts set forth herein are limited to the causes of action

under consideration in connection with the Motions.  Specifically, the Committee indicates that

the Motions relate to the following transfers:

> (i) Transfers in excess of $320,000 by the Debtors to Matthews Holdings, Inc. on
> account of antecedent debt between March 19, 2001 and November 1, 2001; (ii)
> Pledge of the Debtors' assets to collateralize a loan to Matthews and TLA on
> December 21, 2001, in excess of $425,000; (iii) Transfer in excess of $460,000
> by the Debtors to Matthews for interest on undocumented loans in 2001; and (iv)
> Transfer to Matthews of Sound Vision stock owned by the Debtors in September
> 2000 with a liquidation value in excess of $1.25 million without fair consideration
> or reasonably equivalent value.

*See* Notice of Motion, dated August 23, 2004, at 3-4.  In addition, for purposes of these Motions,

the Committee modified its request seeking summary judgment as to $229,475.85 transferred to

MHI, rather than $320,000;  as to $150,321, rather than $425,000, pledged by the Debtors to

collateralize the loan to Matthews and TLA and representing only attorney's fees and legal fees

paid from the proceeds of the loan; and as to $320,171.50 rather than $460,000, representing

interest amounts allegedly paid by the Debtors to BSB for the benefit of Matthews up to the date

the note on a personal loan from BSB to Matthews was recast, namely September 22, 2001.  *See*

Committee's Reply Brief, dated November 16, 2004, at 15, 22 and 19-20, respectively, and

Committee's Post-Hearing Brief, dated January 3, 2005, at ¶¶ 4, 35 and 23, respectively.

After considering the objections raised by Matthews, BSB and TLA to the facts asserted

by the Committee, the following facts are set forth as undisputed:

1.      On February 13, 2002 (the "Filing Date"), involuntary petitions for relief pursuant
        to § 303 of the Bankruptcy Code were filed against the Debtors.  An order for
        relief was entered in each of the above cases on March 15, 2002, effective as of
        March 11, 2002.  At or about the same time, an order was entered directing the
        joint administration of the above cases.

2.      On March 16, 2002, the Office of the United States Trustee directed the

creation/formation of the Committee pursuant to § 1102 of the Bankruptcy Code.

3.  At all relevant times, Matthews was the sole shareholder (either directly or indirectly) and chief executive officer of the Debtors, Matco Group, Inc. ("Group") and MHI.

4.  Davis, who was the secretary/treasurer of the Debtors until March 2001, is an officer of Group, and the sole shareholder and president of TLA.

5.  Sound Vision, Inc. ("Sound Vision") is a Delaware corporation authorized to do business in the State of New York.

6.  MHI is an insider of the Debtors.

7.  The following checks were written by Matco to MHI between March 19, 2001 and September 7, 2001:

| Date | Check No. | Amount |
|------|-----------|--------|
| 3/15/01 | 5577 | $ 24,518.70 |
| 6/1/01 | 5846 | $ 79,086.83 |
| 6/6/01 | 5857 | $ 35,000 |
| 8/2/01 | 10111 | $ 50,000 |
| 9/7/01 | 10255 | $110,000 |

*See* Exhibit A, attached to Committee's Motion.[8]

8.  At all times relevant to the causes of action, the Debtors had one or more creditors.

9.  In response to the Committee's document production demand, Matthews provided various tax returns to the Committee. *See* Committee's Exhibit C.

10. In response to the Committee's request for all documents evidencing and/or relating to monies, payments and other consideration paid to or received by Matthews from September 2000 until November 2002 from any and all of the other defendants, Matthews replied, "None." *See* Committee's Exhibit D.

11. According to Clarence Saager, beginning in late 2000, Matco did not have sufficient monies to pay "older" debts that were past due, as distinguished from

---

[8]  The Committee's Motion also lists Check No. 5665 in the amount of $27,000. However, the Court is unable to locate a copy of the check in the exhibit.

new debts.  *See* Committee's Exhibit F.

12.    Matthews admitted that the Debtors were unable to meet their obligations as they
        matured at the time of various contested transfers identified in the Complaint.  *See*
        Committee's Exhibit G (Answer to ¶ 144 of the Complaint).

13.    On December 21, 2001, Matthews executed a demand note ("Matthews Demand
        Note") in favor of BSB in the amount of $428,556.38.  *See* Committee's Exhibit
        H.

14.    The Matthews Demand Note, dated December 21, 2001, was one of several items
        assigned to TLA on that same day.  Other items included the BSB I Loan and the
        Recast Loan, as referenced at ¶¶ 23 and 27, below.  *See* Committee's Exhibit I
        (Assignment at ¶ 47).

15.    TLA executed a demand note, dated December 21, 2001, in favor of BSB in the
        amount of $12 million.[9]  *See* Committee's Exhibit J.

16.    As collateral for these demand notes, TLA received a security interest in all of the
        Debtors' assets.  *See* Committee's Exhibit L.  Matthews testified that he was not
        aware of any value that Matco got for collateralizing the loan that TLA obtained
        from BSB.  *See* Committee's Exhibit N.

17.    In March 2000, $5 million of debt owed by Sound Vision to the Debtors was
        converted to stock in Sound Vision.  *See* Committee's Exhibit G, Complaint and
        Answer Excerpt.

18.    Matthews became a director and shareholder of Sound Vision.  *Id.*

19.    Thereafter, in or about September 2000, the Debtors transferred its stock in Sound
        Vision to Matthews for a book entry credit.  *Id.* and Exhibit O at 73.

20.    According to the June 30, 2001 financial statement of James and Judith Matthews,
        Matthews maintained 50,000 shares of Series A Preferred Stock in Sound Vision
        with a listed value of $5 million.  *See* Committee's Exhibit G, Complaint and
        Answer Excerpt.

_____

        [9] According to the Davis affidavit, sworn to October 14, 2004, the TLA Demand Note,
executed on December 21, 2001, included the balance of the Recast Note, the balance of the BSB
I Loan and the Matthews Demand Note of $428,556.38.  *See* Davis Affidavit at ¶ 9.  The latter
proceeds were used  to pay interest on the BSB I Loan, interest on the Recast Loan and certain
transaction fees ($120,246) and legal fees ($30,075).  *Id.*  It is the latter two amounts that the
Committee is seeking to avoid in its request for partial summary judgment.

21.    At the time of the transfer of the subject stock from the Debtors to Matthews, the Debtors were "unable to meet its [sic] obligations as they became due." *Id.*

BSB also submits additional alleged undisputed facts, including:

22.    BSB made a loan to Matthews (the "Matthews Loan") in November 1997.

23.    On or about May 14, 1998, Matco and American Board Companies, Inc. executed a promissory note ("Note 1") as co-borrowers in favor of BSB as lender ("BSB Loan I"). BSB Loan I was guaranteed by Matthews and all of the Matco subsidiaries.

24.    On or about May 14, 1998, as security for repayment of BSB Loan I and all other debt to BSB whether existing then or incurred later, Matco and the Matco subsidiaries executed and delivered to BSB commercial security agreements (the "Security Agreements") pursuant to which Matco and the Matco subsidiaries granted BSB a security interest in all Inventory, Accounts, Equipment and General Intangibles "whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located (emphasis added by BSB).

25.    As of December 12, 2001, the amount owed to BSB by virtue of an assignment of the debt owed to the National Bank of Canada ("NBOC") by the Debtors was $13,772,614.46.

26.    The NBOC debt was secured by essentially all of Matco's and its subsidiaries' assets, as well as certain personal property of Matthews.


## ARGUMENTS


## The "Holding Transfers" by Matco to MHI between March 15, 2001 and November 1, 2001[10]

The Committee points out that MHI does not contest the transfers; rather, it takes

exception to the methodology used by William K. Lenhart ("Lenhart"), the co-national director

of BDO Seidman's financial recovery services, the financial advisors to the Committee, in

---

[10]    The Committee alleges that Check No. 10255, dated September 7, 2001, actually cleared Matco's account on November 1, 2001. The Committee's 2003 Amended Complaint does not seek to avoid the "Holding Transfers" as fraudulent pursuant to Code §§ 544 and 548. The allegations with respect to the "Holding Transfers" are based on Code § 547.

12

concluding that Matco was insolvent on and after December 2000. The Committee notes that nowhere in MHI's papers is there an assertion of solvency. The Committee contends that it has met its burden via Lenhart's two affidavits, and that MHI has failed to provide any facts to support solvency or to at least raise a genuine issue of material fact in this regard.

With respect to the issue of insolvency, MHI argues that it is the Committee that has the burden to establish insolvency. MHI asserts that for purposes of the Committee's preference action with regard to the payments to MHI, there is no presumption of insolvency pursuant to Code § 547(f) because none of the transfers occurred within ninety days of the filing of the petitions. It is MHI's contention that using the balance sheets attached to the consolidated tax returns of the Debtors to do a fair market valuation for insolvency purposes is inappropriate. Furthermore, MHI contends that because the question of fair market valuation is an issue subject to conflicting expert opinions, a trial will be necessary.

**Interest Payments made to BSB on Matthews Loan/Recast Loan**[11]

The Committee contends that Matco had no obligation to pay interest on Matthews' personal loan from BSB until arguably the recasting of the loan on September 22, 2001. It is the Committee's position that the payment of an estimated $320,171.50 is avoidable as simply a gratuitous transfer for the benefit of an insider, namely, Matthews. Pointing to the fact that he ultimately paid off the entire amount of the "Recast Loan" of several million dollars, Matthews contends that those monies actually provided benefit to the Debtors to an extent far greater than the interest which was paid, despite the fact that they were not parties to the loan. The

---

[11] The payments of interest to BSB on these loans are the only ones addressed in the 2004 Complaint against Matthews.

Committee responds that even if a portion of the Matthews Loan was used to finance the Debtors, without supporting documentation to that effect, the Debtors had no obligation to pay the interest. Furthermore, the Committee argues that even if there had been an agreement requiring the Debtors to pay interest to Matthews or for his benefit to BSB, such payment of an antecedent debt does not constitute fair consideration since the transferee was an officer, director or major shareholder of the transferors. It is the Committee's position that any indirect benefit to the Debtors is only relevant after the Recast Loan was executed on September 22, 2001.

It is Matthews position that the Court should focus on what the net effect of the allegedly fraudulent transfer had on the Debtors' estates, i.e. did it deplete or add to the Debtors' assets ultimately available to creditors.

**Fees Collateralized by Debtors in Connection with Matthews' Demand Note**

The Committee seeks to recover the loan fee of $120,246 and legal fees of $30,075 paid from the proceeds of the Matthews Demand Note in connection with the various transactions that occurred on December 21, 2001, involving TLA. The Committee takes the position that the Debtors received no fair consideration or reasonable equivalent value for collateralizing those fees, i.e. there was no direct benefit to the Debtors. In response, Matthews makes the argument that the assignments allowed the Debtors to continue operations. The Committee responds by pointing out that Matthews' Demand Note was dated December 21, 2001, and the "staged auctions" of inventory occurred in early January 2002 so that the "continued operations" of the Debtors were very brief.

It is Matthews' contention that the Debtors' ability to pay unsecured creditors depended on their ability to liquidate their inventory. The value received by the Debtors in consideration

for collateralizing the payment of the fees, among other things, was the inventory value the Debtors were ultimately able to realize. For example, Matthews points out that the assignments provided the Debtors with an opportunity to sell inventory valued at $6,172,830 to AMS for a cash payment of $2,059,460 or a return of 33.36% of the historical cost of the inventory. Matthews contends that the Debtors ultimately were able to sell approximately $12.2 million worth of inventory for an average of 41% of the Debtors' cost. This, according to Matthews, was far better than the 2% realized from the "Dove bid"[12] and the 10% liquidation estimate of the Committee's appraiser.

BSB points out that because it already held a security interest in all of the Debtors' assets, it received nothing more when the fees were collateralized by those very same assets. According to BSB, it

> agreed to forbear and to purchase the NBOC Debt and provide financing to TLA for the Purchase of BSB Loan I and BSB Loan II to provide the Debtors with 'breathing room' and an opportunity to avoid default and to preserve the value of its assets for their creditors through orderly Article 9 sales. The 'breathing room' turned out to be short lived, not because of BSB's actions, but because certain unsecured creditors commenced an involuntary case after attending a presentation made by the Debtors to their unsecured creditors on December 20, 2001 describing the orderly sale process.

BSB's Brief in Opposition to the Committee's Motion, dated January 3, 2005.

**Transfer of Sound Vision Stock in September 2000**

The Committee contends that the transfer of the Sound Vision stock by the Debtors to

---

[12] On July 29, 2003, the Court signed an Order authorizing the Debtors to retain DoveBid, Inc. as the auctioneer of Debtors' equipment, inventory, and other tangible property, as well as to coordinate the sale of certain real property in Endicott, New York.

Matthews must be presumed to have been fraudulent as it was made between insiders at a time when Matco was unable to pay its debts as they became due.  The Committee takes issue with Matthews' contention that the stock had no value, noting that in March 2000 third parties were willing to invest $21 million in Sound Vision and questioning why Matthews had arranged for Matco to make the transfer if the stock had no value.  According to the affidavit of Lenhart, the stock had a value of at least $1.4 million.

In response, Matthews takes the position that even if the stock was worth $1.4 million at the time of the transfer, he had previously advanced $1.9 million of personal funds to the Debtors for purposes of their making a loan to Sound Vision and that at the time of the transfer the Debtors owed Matthews more than $20 million, citing to the Renewal Subordinated Note, dated March 31, 2000, attached as Exhibit A to the Supplemental Memorandum of law on behalf of Matthews, dated January 3, 2005.  Matthews also contends that valuation of stock in a closely held corporation is not an exact science and is an issue of material fact which is not properly decided on a motion for summary judgment.

The Committee argues that even if Matthews is able to establish that the transfer of the stock was made to satisfy an antecedent debt that Matco allegedly owed to him, repayment of an antecedent debt to an officer, director or major shareholder of the transferor is without fair consideration.

**DISCUSSION**

The moving party seeking summary judgment must establish that there is no genuine issue as to any material fact, thus entitling the movant to judgment as a matter of law.  A genuine issue exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(movant need only illustrate by reference to record opponent's failure to introduce evidence in support of essential element of its claim).  It is the role of the Court on such a motion to determine whether there are issues of fact to be tried; it is not the role of the Court to try the issues of fact.  *See Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983) (citation omitted).

*Official Committee of Unsecured Creditors of Matco Electronics Group, Inc. v. American Board Companies (In re Matco Electronics Group, Inc.)*, Case No. 02-60835-44, Adv. Pro. No. 02-80085, slip op. at 17-18 (Bankr. N.D.N.Y. April 4, 2003) ("April 2003 Decision").  Furthermore, in considering a motion for summary judgment, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted).  Once the Committee has come forward with evidence on each material element of its claims, it is the Defendants' burden to rebut the facts asserted by the Committee.  The Defendants may not simply rely on "mere allegations or denials."  Fed.R.Civ.P. 56(e).  In addition, the Court notes that the principles concerning admissibility of evidence remain the same on a motion for summary judgment as they would at trial.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

**Admissibility of Evidence to Support Committee's Motion**

*Affidavit of William K. Lenhart*

Affidavits of an expert certified public accountant to establish insolvency are admissible in connection with a motion for summary judgment. *See In re Colonial Realty Co.*, 209 B.R. 819, 821-22 (Bankr. D.Conn. 1997); *see also United States v. Johns-Manville Corp.*, 259 F.Supp. 440, 457 (E.D.Pa. 1966) (indicating that having reviewed the credentials and competency of the expert witness, his affidavit testimony was admissible).   "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004), citing Fed.R.Civ.P. 56(e).

The Committee has submitted the affidavits of Lenhart[13] in support of its contention that the Debtors were insolvent during all relevant times on and after December 31, 2000.   *See* Committee's Exhibit B and Supplemental Affidavit of Lenhart, sworn to on November 12, 2004. Lenhart relied on the balance sheets of the Debtors as of December 31, 2000 and December 31, 2001 from the federal tax returns of Matco and the separate tax returns of U.S. Assemblies in Georgia, Inc. for 2000 and 2001 "for the purpose of preparing my preliminary insolvency analysis since there were no audited or reviewed financial statements as of these dates prepared by an independent accountant."   *See* Exhibit B at ¶ 7.   In arriving at his conclusion that the Debtors were insolvent from at least December 31, 2000, he wrote off advances to affiliates "as they were not collectable" in his opinion. *See id.* at ¶ 7(A).   He took issue with the Debtors

---

[13] For purposes of this motion, the Court will consider Lenhart as an expert based on his 20 years of accounting experience, as well as his certification as Certified Fraud Examiner, a Certified  Turnaround Professional and Certified Insolvency and Restructuring Advisor, as set forth in his professional profile. *See* Committee's Exhibit B.

18

having recorded a portion of the NBOC and BSB liabilities on the books of each debtor and non-debtor balance sheets instead of recording them on Matco's balance sheets and then recording intercompany transfers reflecting the actual use of the funds. *Id.* at ¶ 7(B). Instead, Lenhart recorded the full balance due to NBOC and to BSB for each debtor based on the fact that each was jointly and severally liable on the obligations. *Id.* at ¶ 7(C). He also noted that additional adjustments might be necessary if and when additional information was made available, but he did not believe that any such information would change his conclusion that the Debtors were insolvent from at least December 31, 2000. *Id.* at ¶ 7(F). In his analysis, he found that the deficits for the various debtors ranged from $27,456,562 and $51,739,691 as of December 31, 2000, to $8,535,583 to $39,685,176 as of December 31, 2001. *Id.* at ¶ 10.

Matthews disputes the entire analysis, arguing that insolvency is a question of fact. Matthews points out that Lenhart has not provided copies of the tax returns on which he relied in order for the Court to be able to follow the adjustments he made. Relying on the affidavit of James Lewis ("Lewis"), sworn to October 12, 2004 (Docket No. 153), Matthews contends that the 2000 and 2001 tax returns were prepared for tax purposes only. *See* Memorandum of Law, submitted on behalf of Matthews, dated October 14, 2004 (Docket No. 145), at 8. Lewis, a certified public accountant and certified valuation analyst, who acted as the outside auditor for Matco and various related entities for "all but two of the years since approximately 1987," prepared the tax returns relied on by Lenhart. *See* Lewis Affidavit at ¶¶ 2 and 3(a). Lewis points out that the values used in those balance sheets were based on historical value less accumulated depreciation as required by the Internal Revenue Code. *Id.* at ¶ 3(a). It is his position that "[t]he figures on the balance sheets are not based on a fair market valuation of the assets." *Id.* Lewis

also takes issue with Lenhart's treatment of the NBOC and BSB loans, again asserting that Lenhart's evaluation of the balance sheets is "without regard to the purposes for which they were prepared." *See* Supplemental Affidavit of Lewis, sworn to December 31, 2004 (Docket No. 161), at ¶ 2(c).

In addition, Davis, Matco's Secretary/Treasurer from 1997 through April 2001 and also Secretary/Treasurer of MHI, takes issue with Lenhart's conclusion that many of the advances made to affiliates were not collectible.  According to Davis, "many of the advances to affiliates were advances to non-debtor affiliates which were collectible."  *See* Davis Affidavit, sworn to October 14, 2004 (Docket No. 149), at ¶ 5(a).

*Checks written on Matco's Account to MHI and Statements of Matco*

The Committee has offered a number of checks written on Matco's account between March 19, 2001 and September 7, 2001, and payable to MHI, in support of its Ninth Cause of Action seeking to avoid various transfers pursuant to Code § 547.  *See* Exhibit A of Committee's Motion. There are also copies of the backs of checks showing various endorsements.  In addition, the Committee has provided copies of statements on which various invoices are listed and on which there is reference to the check numbers of the checks.  For example, Check No. 10255 in the amount of $110,000 is referenced on a statement listing six invoices dated between November 30, 2000 and April 1, 2001, which total $110,000.  *Id.*  There is also a statement listing three invoices between November 1, 2000 and November 30, 2000, totaling $50,000, with reference to Check No. 10111 in the same amount.  *Id.*  There are no copies of any invoices from MHI.

Documents must be properly authenticated in order to be considered by the Court in the

context of a motion for summary judgment.  *See Barlow v. Connecticut*, 319 F.Supp.2d 250, 257

(D.Conn. 2004), *aff'd sub nom. Barlow v. Dep't of Public Health, Connecticut*, No. 04-22915-

CV,  2005 WL 2136961 (2d Cir. 2005).  The fact that they may be authenticated at trial is

irrelevant.  *Id.*

> Matthews has objected to the Committee's statement to the effect that Exhibit A includes
>
> copies of cancelled checks written by the Debtors to Matthews Holding evidencing the underlying payments and copies of invoices issued by Matthews Holding which provide that the payments in question were made against antecedent debts owed by the Debtors to Matthews Holding before such transfers were made.

Committee's Statement of Undisputed Facts at ¶ 9.  Matthews admits to the existence of the

checks and invoices referenced in the statements but disputes the conclusions of fact and law

contained in ¶ 9.

Copies of checks are self-authenticating under Rule 902(a) of the Federal Rules of

Evidence ("Fed.R.Evid.").  *See Ament v. Townsend*, No. 98 C 1918, 1998 WL 299806, *4 (N.D.

Ill. May 29, 1998); *In re International Loan Network, Inc.*, 160 B.R. 1, 7 (Bankr. D. Dist. Col.

1993).  However, the Committee has offered no affidavit to authenticate the statements in which

the invoices are identified by indicating that they are true and accurate copies of the documents

obtained from the Debtors' books and records.  "[W]ritten documents introduced for the truth of

the statements contained therein are generally inadmissible as hearsay unless they meet one of

the recognized hearsay exceptions."  *Mossay v. Hallwood Petroleum, Inc.*, No. CIV.A. 3:96-CV-

2895,  1997 WL 222921, *2 (N.D.Tex. Apr. 28, 1997); *see also In re B&B Utilities, Inc.*, 208

B.R. 417, 424 (Bankr. E.D. Tenn. 1997) (finding that although two separate invoices were

potentially admissible under the business records hearsay exception of Fed.R.Evid. 803(6), [they]

also constitute inadmissible hearsay because a proper foundation has not been laid for their

introduction under the exception"); *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.*,

249 F.Supp. 2d 622, 683 (E.D. Pa.), *amended* 268 F.Supp. 2d 448 (E.D. Pa. 2003) (stating that

"[t]here is no authority for the proposition that a 'court may admit into evidence under the

business exception to the hearsay rule documents containing hearsay simply because there are

some indicia of the trustworthiness of the statements").  In this case, the Committee has submitted

the checks, as well as the statements, in support of their contention that the checks were issued

by Matco with respect to an antecedent debt owed to MHI.  The Court concludes that the

Committee has failed to provide a proper foundation for the Court's consideration of the

statements and also has failed to provide copies of the invoices referenced therein.


*Exhibits concerning Sound Vision, including Financial Statements, Stock Purchase Agreement,
dated March 31, 2000, Stockholders Agreement dated March 31, 2000 and Registration Rights
Agreement dated March 31, 2000 (See Exhibit P of Committee's Motion)*

Lenhart relied on these documents in rendering his opinion concerning the value of the

shares of stock in Sound Vision.  That these documents are arguably hearsay does not affect the

admissibility of his opinion, as an expert, rendered based on their review.  *See International Loan

Network*, 160 B.R. at 6.

### Avoidance of Payments  based on Constructive and Actual Fraud pursuant to Code § 544 and NYD&CL  273-276 (Second Cause of Action of the 2003 Amended Complaint and all Four Causes of Action of the 2004 Complaint)

Under NYD&CL § 273-275, a creditor may avoid a transaction as constructively

fraudulent if it is proven (1) that a transfer was made for less than fair consideration, as defined

in NYD&CL § 272, and (2) that at the time of the transaction, the transferor was either insolvent,

22

a defendant in an action for money damages, engaged in a business with unreasonably small capital, or about to incur debts beyond the transferor's ability to repay. *See Goscienski v. LaRosa (In re Montclair Homes, Inc.)*, 200 B.R. 84, 98 (Bankr. E.D.N.Y. 1996), citing *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 124, 508 N.Y.S.2d 17, 19 (N.Y. App. Div. 1986).

Specifically, NYD&CL § 273 provides that "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to the person's actual intent if the conveyance is made . . . without fair consideration." Thus, a transfer is considered a fraudulent conveyance under NYD&CL § 273 if the requirements of lack of fair consideration[14] and insolvency are met, regardless of the transferor's intent. *In re Centennial Textiles,* Inc., 220 B.R. 165, 171 (Bankr. S.D.N.Y. 1998); *In re Lollipop, Inc.,* 205 B.R. 682, 686 (Bankr. E.D.N.Y. 1997) (citing *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 633 (2d Cir. 1995)).

Generally, NYD&CL § 273 places the burden of proving both lack of fair consideration and insolvency on the party challenging the conveyance. *United States v. McCombs*, 30 F.3d 310, 323-24 (2d Cir. 1994); *Centennial Textiles*, 220 B.R. at 171; *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 191 A.D.2d 690, 692 (N.Y. App. Div. 1993). If the party establishes that the transfer was made without fair consideration, "the law presumes that the transfer rendered [the transferor] insolvent." *In re Corcoran*, 246 B.R. 152, 163 (E.D.N.Y. 2000) (citations omitted). "The burden then shifts to the transferee to overcome that presumption by demonstrating the debtor's continued solvency after the transfer." *Id.*; *see also In re O.P.M.*

---

[14] Avoidance of a conveyance pursuant to NYD&CL §§ 274 and 275 also require that the conveyance be made without fair consideration.

*Leasing Serv., Inc.*, 40 B.R. 380, 393 (Bankr. S.D.N.Y.), *aff'd* 44 B.R. 1023 (S.D.N.Y. 1984) (noting that "the New York Debtor and Creditor Law evinces a policy protective of creditors in placing the burden of going forward with proof of the debtor's solvency on the transferee").

"Fair consideration is given for property, or obligation, (a) [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) [w]hen such property, or obligation, is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property, or obligation obtained."   NYD&CL § 272 (McKinney's 2001). Thus, "fair consideration" has two components, "the fair equivalency of the consideration given for the debtor's transfer and good faith." *In re Le Café Creme, Ltd.* 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000).  For purposes of § 272, the "good faith" at issue is the good faith of the transferee.  *See HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995). In connection with all the transfers at issue based on actual and/or constructive fraud, the Committee relies on the fact that "transfers from an insolvent corporation to an officer, director or major shareholder of that corporation are per se violative of the good faith requirement of DCL § 272 and the fact that the transfer may have been made for a fair equivalent is irrelevant." *Id.*; *Centennial Textiles,* 220 B.R. at 172.

There is an "exception" to that rule, which provides that  payments of pre-existing obligations owed to a director, officer or shareholder are <u>not</u> fraudulent conveyances if the corporation was not insolvent at the time.  As indicated by one New York court,

> It has been held that preferential transfers to directors, officers and shareholders <u>of insolvent corporations</u> in derogation of the rights of general creditors do not fulfill the good-faith requirement of the Debtor and Creditor Law.  "Whether it be upon the theory that directors of insolvent corporations are trustees for the

> benefit of all creditors, or upon the theory that it would be inequitable to allow
> directors to use inside information and their controlling voice in corporate affairs
> to benefit themselves over the claims of others, the common law forbids
> preferences to directors of insolvent corporations as being contrary to principles
> of fair, honest and open dealing."

*Farm Stores, Inc. v. School Feeding* Corp., 102 A.D.2d 249, 254 (N.Y. App. Div. 1984) (quoting

*Southern Industries, Inc. v. Jeremias*, 66 A.D.2d 178, 185 (N.Y. App. Div. 1978) (emphasis

supplied) and also citing *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 215 (N.Y. App. Div.

1979), *aff'd* 48 N.Y.2d 954 (1979)).

It is evident to the Court that the question of insolvency is central to the relief sought by

the Committee with respect to all alleged fraudulent transfers given the fact that the Committee

is relying on the presumption that a transfer to an officer, director, or major shareholder, such as

Matthews, by an insolvent corporation is not in good faith and, accordingly, cannot support a

finding of fair consideration pursuant to NYD&CL § 272.

NYD&CL § 271 provides that "a person is insolvent when the present fair salable value

of his assets is less than the amount that will be required to pay his probable liability on his

existing debts as they become absolute and matured." NYD&CL § 271 "imposes a 'balance

sheet' test, namely assets versus liabilities." *In re Russo,* 1 B.R. 369, 380 (Bankr. E.D.N.Y.

1979); *see also Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*, 621 F.Supp. 198, 220 (S.D.N.Y.

1985) (noting that the "balance sheet test" requires a showing that the debtor's assets, if sold for

fair value (not book value) would be equal to or greater than the liabilities); *Centennial Textiles*,

220 B.R. at 172-73 (noting that "the courts in New York have not, for the most part, drawn any

25

distinction between the UFCA[15] and the Bankruptcy Code's test of insolvency").  Furthermore, the book value of assets found in a balance sheet using generally accepted accounting principles, although relevant, are not determinative in insolvency determinations.  *See In re Lids Corp.*, 281 B.R. 535, 543 (Bankr. D. Del. 2002).  In addition, under NYD&CL § 271 an "inability to pay current obligations as they mature does not show insolvency."  *McCarty v. Nostrand Lumber Co.*, 232 A.D. 63, 66 (N.Y. App. Div. 1931).

The Committee relies on the case of *Eerie World Entertainment, L.L.C. v. Bergrin*, No. 02 Civ. 6513, 2004 WL 2712197 (S.D.N.Y. Nov. 23, 2004) in arguing that the Debtors have failed to assert that they were solvent at the time of the transfers and have offered no proof to counter the opinion of Lenhart.  However, the Committee's reliance on *Bergrin* is misplaced.  Admittedly, the court in *Bergrin* indicated that attempting to rest on pleadings "is not a sufficient response to a motion [for summary judgment] . . . ."  *Id.* at *2.  However, in *Bergrin* it was the plaintiff/debtor, who had the ultimate burden of proof, that was relying on its pleadings in responding to the defendant's motion for summary judgment.  The court's finding in *Bergrin* relied on by the Committee is distinguishable from the matter before this Court in that the Debtors here do not have the burden of proof on the issue of insolvency; rather, it is the Committee that has the burden.

As noted previously, Lenhart relied on the balance sheets of the Debtors as of December 31, 2000 and December 31, 2001, attached to the federal tax returns of Matco and the separate tax returns of U.S. Assemblies in Georgia, Inc. for 2000 and 2001 in preparing his "preliminary"

---

[15] UFCA is the "Uniform Fraudulent Conveyance Act, as adopted by the State of New York in NYD&CL Article 10, specifically § 273.  *Centennial Textiles*, 220 B.R. at 171.

26

insolvency analysis. In his affidavit, he notes that at the time of his analysis, there were no audited financial statements available to him and that the possibility existed that "[a]dditional fair value adjustments may be required to prepare an expert report." *See* Committee's Exhibit B at 6. It was his opinion that "any adjustments would not be sufficient to change my opinion that the sum of each of the Debtors' debts is greater than all of its property at a fair valuation as of at least December 31, 2000 and continuing thereafter." *Id.* "The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 35 (2d Cir. 1996). In this case, the Court finds that the Committee has failed to meet its burden at this juncture of establishing insolvency of the Debtors beginning December 31, 2000, by a preponderance of the evidence for purposes of summary judgment. Lenhart himself acknowledges that his conclusions, based primarily on the balance sheets attached to the Debtors' tax returns for 2000 and 2001, are only preliminary. As pointed out by Lewis, the figures appearing on the balance sheets are not appropriate for making an insolvency determination given the fact that they were based on historical value, less accumulated depreciation, as required by the Internal Revenue Code. A witness's testimony concerning the value of assets must be deemed reliable by the Court before it can be used to establish fair market value. *See In re Manshul Const. Corp.*, No. 96B44080, 96B44079, 97 CIV. 8851, 99 CIV. 2825, 2000 WL 1228866, at *40 (S.D.N.Y. Aug.30, 2000). In this case, Lenhart's "preliminary" opinion is insufficient, in the view of this Court, to establish insolvency for purposes of NYD&CL § 272 so as to find the transfers under discussion per se violative of good faith. This remains a genuine issue of material fact. Accordingly, the Court must deny the Committee's request for summary judgment in connection with the first three causes of action in the adversary

proceeding against Matthews (Adv. Pro. 04-80075) pursuant to NYD&CL §§ 273-275 based on constructive fraud, as well as the second cause of action against the Debtors (Adv. Pro. 02-80095), to the extent that it seeks to avoid transfers pursuant to NYD&CL §§ 273-275.

Code § 548 permits avoidance of a transfer if it is established that the Debtor had an interest in the property, that a transfer of that interest occurred within one year[16] of the filing of the petition, that the Debtor was insolvent at the time of the transfer or became insolvent as a result thereof, and that the Debtor received less than reasonable equivalent value in exchange for such transfer. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994). In addition, the Court notes that under Code § 548, there is no presumption of insolvency of a debtor during the 90 days immediately prior to the filing of the petition as there is in an avoidance action under Code § 547. *See In re Schultz*, 250 B.R. 22, 28 n. 3 (Bankr. E.D.N.Y. 2000); *In re Larry's Marineland of Richmond, Inc.,* 166 B.R. 871, 873 (Bankr. E.D. Ky. 1993); *In re War Eagle Floats, Inc.*, 104 B.R. 398, 400 (Bankr. E.D. Okla. 1989).

Code § 548(a)(1)(B) allows for avoidance of transfers and obligations incurred within one year prepetition for which "reasonably equivalent value" is not received by the debtor. Although the definition of 'fair consideration' under the NYD&CL expressly incorporates the concept of good faith in making a transfer,[17] the term 'reasonably equivalent value' does not." *In re Bennett*

---

[16] Pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), signed into law on April 20, 2005, and made applicable to cases filed after October 16, 2005, Code § 548 was amended to allow avoidance of a transfer of an interest of a debtor that occurred within two years of the filing of the petition. This provision, however, will not take effect until one year after the date of the enactment of BAPCPA.

[17] Interestingly enough, Code § 548(c) shifts the burden of proof by providing defendants with an affirmative defense if they are able to establish that they received the transfer from the debtor in exchange for value and in good faith. *See Jobin v. McKay (In re M&L Business Mach.*

*Funding Group, Inc.*, 220 B.R. 743, 754 n.15 (Bankr. N.D.N.Y. 1997) (citing *McCombs*, 30 F.3d at 326 n.1).

For purposes of Code § 548(a)(1)(B), "insolvency" is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of (i) property transferred, concealed or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title." 11 U.S.C. § 101(32). In determining insolvency, the Code applies a balance sheet analysis which tests whether at the time of a particular transfer the transferor's debts exceeded the "fair valuation" of its assets, exclusive of property exempted or fraudulently transferred. In this regard,

> factual findings must be made as to the fair valuation of the debtor's assets. In this context, fair valuation does not mean historical value or cost, or refer to the value of the debtor's assets under the worst or best circumstances. Instead, fair valuation is measured by a hypothetical liquidation of the debtor's assets over a reasonable period of time.

*In re Southwest Equipment Rental, Inc.*, No. CIV-1-90-62, 1992 WL 684872, at *21 (E.D. Tenn. July 9, 1992). Based on the Court's earlier conclusions regarding Lenhart's opinion concerning the Debtors' alleged insolvency, the Court must also deny the Committee's motion for summary judgment to the extent that it is based on Code § 548(a)(1)(B).

The Committee's second cause of action against the Debtors (Adv. Pro. 02-00095), as well as its fourth cause of action against Matthews (Adv. Pro. 04-00075), also seeks to avoid the transfers pursuant to NYD&CL § 276 and Code § 548(a)(1)(A), based on allegations of actual

---

*Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

fraud.  NYD&CL § 276 provides that "[e]very conveyance made and every obligation incurred

with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either

present or future creditors, is fraudulent as to both present and future creditors."  NYD&CL §276

(McKinney's 2001 & Supp. 2005).

Code § 548(a)(1)(A) and NYD&CL § 276 each allow for avoidance of certain transfers

of an interest in property of the debtor made, or obligations incurred, with <u>actual intent</u> to hinder,

delay or defraud creditors.  The standard for such proof of actual intent pursuant to NYD&CL

§ 276 is clear and convincing evidence.  *See Lippe v. Bairnco Corp.*, 249 F.Supp. 2d 357, 374

(S.D.N.Y. 2003), *aff'd* 2004 WL 1109846 (2d Cir. 2004).    There is a split of authority

concerning whether the standard of proof for Code § 548(a)(1)(A) is the higher standard, as well.

*See In re McCook Metals, L.L.C.*, 319 B.R. 570, 587 n.11 (Bankr. N.D. Ill. 2005); *In re Adler*

*Coleman Clearing Corp.*, 247 B.R. 51, 86 n.52 (Bankr. S.D.N.Y. 1999).

Furthermore, "the payment of fair consideration does not preclude liability under § 276

if the requisite intent is proven."  *Id.*   In addition, unlike § 272, the "good faith" at issue in the

context of "fair consideration" applied in the case of actual fraud under § 276, is that of the

transferor, not the transferee.  *See HBE Leasing*, 61 F.3d at 1059 n. 5.  Also of note is the fact that

if the assets of the Debtors were not depleted or diminished as a result of the transfer, there is no

basis for avoiding the transfer.  *See Bairnco* Corp., 247 F.Supp. 2d at 375.

As a general rule, the question of fraudulent intent is a question of fact that will preclude

summary judgment.  *See Jensen v. Jensen*, 256 A.D.2d 1162 (N.Y. App. Div. 1998).   In

considering whether the transfers were made with actual intent to hinder, delay or defraud, the

courts rely on certain "badges of fraud," including

(1) the lack of or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors, and (6) the general chronology of events and transactions under inquiry.

*Solomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (citing *In re May*, 12 B.R. 618, 627 (Bankr. N.D. Fla. 1980)); *see also Elgin Sweeper Co. v. Melson, Inc.*, 884 F. Supp. 641, 649 (N.D.N.Y. 1995) (indicating that "intentional fraud"

is normally inferred from circumstances surrounding the transfer. . . . Factors considered include close relationships among parties to a transaction, secrecy and haste in making the transfer, inadequacy of consideration, and the transferor's knowledge of creditors' claims and his own inability to pay them. . . . Only an actual intent to *hinder and delay* need be established, not an actual intent to *defraud*, and lack of fair consideration gives rise to a rebuttable presumption of fraudulent intent. (citations omitted). (emphasis supplied in original)).

In its 2003 Amended Complaint, the Committee makes specific reference to NYD&CL § 276 in relation to the pledge of the Debtors' assets in connection with the transactions on December 21, 2001. The Committee contends that the transfer of a security interest in the Debtors' assets was for no consideration between insiders and was made with the intent to hinder, delay and/or defraud creditors. Keeping in mind that the Committee's current motion for summary judgment is limited to the attorney's fees and legal fees of BSB, the Court does not believe it has been presented with sufficient evidence, other than allegations and conclusions of the Committee, to meet the standard of clear and convincing proof of actual fraud, either pursuant to NYD&CL § 276 or Code § 548(a)(1)(A).[18]

---

[18] It is unclear in New York whether a creditor must establish constructive fraud by a preponderance of the evidence or by clear and convincing evidence. *See Cadle Co. v. Newhouse*,

The Committee also makes reference to NYD&CL § 276 in its fourth cause of action against Matthews in its 2004 Complaint with respect to interest payments made to BSB of $320,171.50 prior to the "Recast Loan" on September 22, 2001.  While the Committee contends that it was merely a gratuitous transfer for Matthews' benefit, Matthews argues that the Court's focus should be on the net effect of the transfer and whether it actually depleted the Debtors' assets as the Committee argues.  The Court is of the opinion that the Committee's proof regarding this transfer also has not satisfied the clear and convincing standard of proof.

### Sixth Cause of Action - Equitable Subordination

The Committee asserts on information and belief that

> BSB, TLA individually and as agent for BSB, AMS, ABC, the Debtors, Sound Vision, Inc. Innovation Associates, Inc., GAP Technologies, Inc., Matco Group, Inc., Matthews, Hargreaves and Davis, in conjunction with, *inter alia,* the Transfers engaged in an improper course of conduct as detailed above, the effect of which was to, *inter alia*: (i) divert the Debtors' assets, through reconstituting the businesses as new entities, under the control of current and/or former insiders of the Debtors, while unsecured claims are left to attach to the Debtors' empty shell; and (ii) encumber and divert assets of the Debtors which were otherwise available to satisfy unsecured claims.

2003 Amended Complaint at ¶ 170.

With respect to the transfers discussed herein in the context of the Motions for partial summary judgment, the Committee focuses on the Matthews' Demand Note and that of TLA, arguing that the Debtors' fraudulent conduct supports that relief as well.   "Equitable subordination is generally limited to cases involving fraud, illegality or breach of fiduciary duty, undercapitalization or control or use of the debtor as an alter ego for the benefit of the claimant."

---

No. 01 Civ. 1777, 2002 WL 1888716, at *5 n.5 (S.D.N.Y. Aug. 16, 2002), *aff'd* 74 Fed.Appx. 152 (2d Cir. Sept. 12, 2003).

32

*In re Global Service Group, LLC,* 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004); *see Liberty Mut.*

*Ins. Co. v. Leroy Holding Co., Inc.*, 226 B.R. 746, 755 (N.D.N.Y. 1998).  Since the Court has

concluded that the Committee has failed at this juncture to meet its burden of proof with respect

to their allegations of both constructive and actual fraud, the Court must also deny this aspect of

the Committee's motion.

The Court is of the opinion that there are genuine issues of fact that must first be decided

and that it would be inappropriate to grant summary judgment on the Committee's second, third

and sixth causes of action in the 2003 Amended Complaint and the four causes of action in the

2004 Complaint at this stage of the proceedings.

**Ninth Cause of Action - Avoidance of Preferential Transfer based on Code § 547 (Ninth
Cause of action of the 2003 Amended Complaint)**

A transfer may be avoided as a preference if each of five conditions is satisfied and none

of seven exceptions are applicable.  *See Union Bank v. Wolas*, 502 U.S. 151, 154 (1991); *In re*

*Ogden*, 314 F.3d 1190, 1196 (10th Cir. 2002).  The conditions, which are set out in Code § 547(b),

are that the transfer of an interest of the debtor in property must have been made: (1) for the

benefit of a creditor; (2) on account of an antecedent debt; (3) while the debtor was insolvent; and

(4) within ninety days before the bankruptcy [within a year if the creditor was an insider at the

time of the transfer]; and (5) it must have enabled the transferee to receive a larger share of the

estate's assets than it would have received if the transfer had not been made and the estate's

assets had been liquidated under chapter 7.  *Id.*  Transfers that have no real distributional

consequences are entirely beyond the purview of preference law.  *See Palmer Clay Products Co.*

*v. Brown*, 297 U.S. 227, 229 (1936) (construing § 60(b) of the 1898 Bankruptcy Act, which is

33

the current Code § 547(b); *see also In re Honey Creek Entertainment, Inc.*, 246 B.R. 671, 688

(Bankr. E.D. Okla. 2000), *rev'd on other grounds*, 37 Fed.Appx. 442 (10th Cir. 2002) (noting that

"the fundamental inquiry under § 547(b) is whether the transfer diminished or depleted the

debtor's estate").    The Committee, as plaintiff, bears the burden of proof on each of these

elements by a preponderance of the evidence standard. *See Roblin Indus.*, 78 F.3d at 34; *Le Café*

*Creme*, 244 B.R. at 231.

In this case, the Committee's ninth cause of action of the 2003 Amended Complaint

generally alleges that the transfers under consideration in connection with its motion for summary

judgment were preferential.  As set forth in the facts, the "Filing Date" for the Debtors' cases is

February 13, 2002.  Where the transfers involve insiders of the Debtors, the critical period of time

to be considered runs from February 13, 2001 until the Filing Date; otherwise, the critical 90 day

period would run from November 15, 2001 until the Filing Date.   The transfer of the Sound

Vision stock to Matthews by Matco in September 2000 falls outside of either of the two

preference periods.  The transfer involving the granting of a security interest by the Debtors to

BSB in relation to the loan fee of $129,246 and the legal fees of $30,075 on December 21, 2001,

does fall within the preference period.  So too the transfers by Matco to MHI, an insider of the

Debtors, which allegedly occurred between March 15, 2001 and November 1, 2001, also fall

within the preference period.  With respect to the interest payments paid by Matco on behalf of

Matthews and allegedly reflected on his 2001 tax return as income, totaling $460,089, the

document on which the Committee relies is a one page document labeled "Federal Statements,"

apparently for James F. and Judith Matthews, in which there is listed interest income from Matco

Electronics in the amount of $460,089.  The Committee has simply prorated that amount for the

254 days through September 22, 2001, when the Recast Loan was executed, and seeks a determination with respect to $320,171.50. However, not only is the document inadmissible in its current form, but it also gives no indication of when the interest payments were actually made by Matco in 2001. If any were made prior to February 13, 2001, they would fall outside the preference period.

With respect to the transfer(s) involving MHI, the Court previously found that the invoices were not admissible for purposes of the Committee's motion. Therefore, the Court finds that the Committee has failed to establish at this juncture that the checks written on Matco's account to MHI represented payments on an antecedent debt and that MHI was a creditor of Matco. As was the case with Code § 548, Code § 547 also requires the application of a "balance sheet" test for insolvency, comparing assets to debts. As discussed above, proof of such insolvency is also lacking, and the presumption found at Code § 547(f) is also inapplicable since all of the transfers from Matco to MHI occurred outside of the ninety day window. Accordingly, the Court must deny that portion of the Committee's motion for summary judgment.

With respect to the collateralization of the loan fees of $129,46 and the legal fees of $30,075, there is a presumption that the Debtors were insolvent when the transfer occurred on December 21, 2001. 11 U.S.C. § 547(f). The Debtors have offered no evidence to rebut this presumption. From the Court's point of view, however, there is a question whether the collateralization of those fees by the Debtors allowed BSB to receive a larger share of the estate's assets had they been liquidated, particularly given the extent of BSB's security interests in the Debtors' assets. Therefore, the Court must deny this aspect of the Committee's motion for partial summary judgment.

35

Based on the foregoing, it is hereby

ORDERED that the Committee's motion for partial summary judgment with respect to its second, third, sixth and ninth cause of action asserted in the 2003 Amended Complaint is denied to the extent discussed herein; and it is further

ORDERED that the Committee's motion for partial summary judgment with respect to the four causes of action asserted in the 2004 Complaint is denied to the extent discussed herein.


Dated at Utica, New York

this 19th day of December 2005


/s/ Stephen D.  Gerling
STEPHEN D.  GERLING
Chief U.  S.  Bankruptcy Judge